IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FREDI GARCIA, *et al.* | )<br>)<br>) |
| Plaintiffs, | )  **Civ. No. 08-1291**<br>)  **(SECT. C, MAG. 4)** |
| v. | )<br>) |
| AUDUBON COMMUNITIES MANAGEMENT, LLC, *et al.* | )<br>)<br>) |
| Defendants. | )  **Collective Action**<br>)<br>)<br>) |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>EMERGENCY MOTION FOR U-VISA CERTIFICATION</u>**

For the reasons set forth herein, Plaintiffs respectfully request that this Court certify that Plaintiffs Fredi Garcia, Reyes Aguilar-Garcia, and Jose Salvador Balladares[1] ("the moving Plaintiffs") "have been helpful, are being helpful, or likely will be helpful" in the investigation or prosecution of Defendants' violations of federal forced labor and involuntary servitude prohibitions. Such judicial certification would allow the moving Plaintiffs to petition the U.S. Customs and Immigration Service for U visa relief, which – if granted – would permit them to remain in the United States to complete presentation of their forced labor and involuntary servitude claims under the Trafficking Victims Protection Act. These claims are pending before this Court as Counts I and II of the Plaintiffs' complaint. (Doc. 1 ¶¶ 75-84.) The certification of the moving Plaintiffs' U

---

[1] Plaintiff Jose Salvador Balladares' last name was misspelled "Valladares" in the caption and body of the Complaint initiating this action. (Doc. 1 ¶¶ 10, 65, 69, 109, 115.)

1

visas requires immediate consideration because, as set forth in their Complaint, these Plaintiffs were reported to U.S. Immigration and Customs Enforcement ("ICE") in unlawful retaliation for their having requested payment of wages through their counsel. (Doc. 1 ¶¶ 62-9, 108-115.) The moving Plaintiffs have been placed in removal (or deportation)[2] proceedings as a result and are in imminent danger of being removed to Honduras, thereby frustrating their ability to participate in this proceeding or otherwise redress the involuntary servitude crimes which they suffered.

### I.    Procedural History

Plaintiffs filed the instant lawsuit on March 17, 2008. Defendant Audubon-Algiers, LLC has been served with the Summons and Complaint in this action. (Docs. 1-2). Plaintiffs expect that the remaining Defendants, which reside in the state of New York, will be served shortly. The Defendants have not yet proffered their answers.

### II.   This Court Should Certify Plaintiffs' Applications for U Visa Relief.

#### A.    The Moving Plaintiffs Offer A Preliminary Showing That They Are Qualified for U Nonimmigrant Visas.

Congress created the U visa nonimmigrant classification with the passage of the Victims of Trafficking and Violence Prevention Act of 2000 ("TVPA"). See Pub. L. No. 106-386, § 1513, 114 Stat. 1464, 1533-37; see also 72 FR 53014-15. "The purpose of the U nonimmigrant classification is to strengthen the ability of law enforcement agencies to investigate and prosecute such crimes as . . . trafficking in persons, while offering protection to alien crime victims in keeping with the humanitarian interests of the United States." 72 FR 53014 (summary of U.S. Citizenship and Immigration Services comments

---

[2] Prior to April 1997 deportation and exclusion were separate removal procedures. The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 consolidated these procedures which are now collectively referred to as removal.

on interim U visa regulations). To be eligible for U visa relief, an alien (1) must have "suffered substantial physical or mental abuse as a result of having been a victim of criminal activity" enumerated by the Act; (2) must "possess[] information" concerning the qualifying criminal activity; and (3) must have "been helpful, is being helpful, or is likely to be helpful" in the investigation or prosecution of the qualifying criminal act. See 8 U.S.C. § 1101(a)(15)(U)(i). One of the qualifying criminal acts is involuntary servitude, as well as "any similar activity in violation of federal, state, or local criminal law. See 8 U.S.C. § 1101(a)(15)(U)(iii).

### 1. The Moving Plaintiffs Are Victims of Involuntary Servitude

Petitioners for U nonimmigration status must be a "victim" of one of the enumerated offenses. See 8 U.S.C. § 1101(a)(15)(U)(iii)(1). U.S. Department of Homeland Security ("DHS") regulations define a "victim of qualifying criminal activity" as "an alien who has suffered direct or proximate harm as a result of the commission of qualifying criminal activity." 8 C.F.R. § 214(a)(14). The moving Plaintiffs are direct victims of involuntary servitude and the similar crimes of forced labor and trafficking with respect to peonage, slavery, involuntary servitude, or forced labor.

Any person who "knowingly and willfully holds to involuntary servitude" another person has violated has violated federal criminal law. See 18 U.S.C. § 1584; 19 U.S.C. § 1589. Congress has defined involuntary servitude as

> a condition of servitude induced by means of--
>
> (A) any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or
>
> (B) the abuse or threatened abuse of the legal process.

3

22 U.S.C. § 7102(5).

Prior to the passage of the TVPA, the U.S. Supreme Court had adopted a narrow interpretation of the involuntary servitude prohibition, requiring actual physical or legal coercion. See United States v. Kozminski, 487 U.S. 931, 949-52 (1988). When Congress enacted the TVPA, it overturned, on invitation of the Kozminski Court, the requirement that an actual objective threat occur. See United States v. Marcus, 487 F. Supp. 2d 289, 302 (E.D.N.Y. 2007)(Congress enacted the TVPA's expanded definition of involuntary servitude "as a response to the Supreme Court's decision in Kozminski"). Language allowing psychological coercion was thus adopted. See 22 U.S.C. § 7102(5) ("any scheme, plan, or pattern *intended to cause a person to believe* that. . ."); see also 22 U.S.C. § 7101(13)-(14) (congressional findings regarding the passage of the TVPA); United States v. Bradley, 390 F.3d 145, 150 (1st Cir. 2004), *judgment vacated on other grounds*, 545 U.S. 1101 (2005) (the TVPA was indeed intended to encompass "subtle psychological methods of coercion."). The TVPA also created a new crime of forced labor, which relied upon the same language as the TVPA's definition of involuntary servitude, compare 22 U.S.C. § 7102(5); 18 U.S.C. § 1589,[3] as well as the crime of human trafficking, which incorporated the crime of involuntary servitude. See 18 U.S.C. § 1590. The Plaintiffs are victims of involuntary servitude, forced labor, and trafficking for involuntary servitude and forced labor (collectively "involuntary servitude").

---

[3] The 2003 TVPA reauthorization created a private right of action for violations of these forced labor provisions as well as for trafficking with respect to involuntary servitude and other violations of Title 18, Chapter 77 of the U.S. Code. See 18 U.S.C. § 1595; 18 U.S.C. § 1590.

At the core of the moving Plaintiffs' involuntary servitude claims are the Defendants' illegal and pervasive threats issued when the moving Plaintiffs stopped working for want of wage payment. It is based on these threats, which Defendants have subsequently proven were not empty, that the moving Plaintiffs felt they had no choice but to continue to toil for the Defendants while getting little or no pay.

Wages came sporadically if they came at all during the moving Plaintiffs employment by the Defendants. Moving Plaintiff Reyes Aguilar-Garcia was not paid at all until he had worked for the Defendants for seven weeks. (Pl. Ex. 1, Decl. of Reyes Aguilar-Garcia ("Aguilar-Garcia Decl.") at ¶ 6). Moving Plaintiff Fredi Umberto Mejivar-Garcia was not paid for twelve consecutive weeks. (Pl. Ex. 2, Decl. of Fredi Umberto Mejivar-Garcia ("Mejivar-Garcia Decl.") at ¶ 9). When the moving Plaintiffs were paid, it was often only enough to subsist and to service their ever-increasing debts (Mejivar-Garcia Decl. at ¶ 10); (Pl. Ex. 3, Decl. of Jose Salvador Balladares ("Balladares Decl.") at ¶¶ 8, 14), and the wages were parceled out only at a level sufficient to coerce the Plaintiffs' continued employment. (Aguilar-Garcia Decl. at ¶ 6; Mejivar-Garcia Decl. at ¶¶ 9, 15).

On multiple occasions, the moving Plaintiffs tried to stop working after they had not been paid for extended periods of time. (Balladares Decl. at ¶ 9; Aguilar-Garcia Decl. at ¶ 6; Mejivar-Garcia Decl. at ¶ 11). Invariably, when this occurred, the Defendants would threaten the moving Plaintiffs with eviction, arrest, and deportation, effectively forcing the moving Plaintiffs to return to work. (Aguilar-Garcia Decl. at ¶¶ 6-8, 10; Mejivar-Garcia Decl. at ¶¶ 11-16).   The Defendants followed through on their threats. On one occasion, Defendants locked six of the Plaintiffs out of their housing,

causing them to be temporarily homeless, after they had complained about not getting paid. (Aguilar-Garcia Decl. at ¶ 7; Mejivar-Garcia Decl. at ¶ 13; Balladares Decl. at ¶ 12). This, of course, had a significant chilling effect on all of the Defendants' employees. (Aguilar-Garcia Decl. at ¶¶ 7-8; Mejivar-Garcia Decl. at ¶¶ 13-14). The message to these Plaintiffs, and to the remaining workers, was that they would be made homeless if they did not continue to work, in spite of the non-payment or insufficient payment of wages.

The threat of being made homeless is exactly the kind of serious harm contemplated by the TVPA's definition of involuntary servitude, particularly in post-Katrina New Orleans, where there are significant public safety concerns and very limited availability of low-rent housing. See, e.g. Bradley, 390 F.3d at 153 (a victim's "special vulnerabilities" should be considered when whether there was a threat of serious harm). Further, threatening a worker with arrest and deportation "clearly falls within the concept and definition of 'abuse of legal process' since the alleged objective for same was to intimidate and coerce the workers into forced labor." United States v. Garcia, Case No. 02-CR-110S-01, 2003 U.S. Dist. LEXIS 22088, *23 (W.D.N.Y. 2003). Combined, the threats of homelessness and deportation convinced the moving Plaintiffs that they had no choice. (Balladares Decl. at ¶ 13.) Moving Plaintiff Aguilar-Garcia avers that "[w]ithout any money, Audubon Pointe was the only place we had to sleep and we could not survive if we were to lose this housing, as bad as it was. My family could not survive if I was deported from the United States, which is why I stayed and worked." (Aguilar-Garcia Decl. at ¶ 8). For these reasons, the moving Plaintiffs are victims of involuntary servitude.

### 2. The Moving Plaintiffs Suffered Substantial Physical and Mental Abuse as a Result of Defendants' Crimes.

To be eligible for U visa relief, an alien must have "suffered substantial physical or mental abuse as a result of having been a victim of criminal activity" enumerated by the Act. See 8 U.S.C. § 1101(a)(15)(U)(iii)(1). To determine whether suffered abuse is substantial, a number of factors may be considered, including:

> The nature of the injury inflicted or suffered; the severity of the perpetrator's conduct; the severity of the harm suffered; the duration of the infliction of the harm; and the extent to which there is permanent or serious harm to the appearance, health, or physical or mental soundness of the victim. . . . A series of acts taken together may be considered substantial physical or mental abuse even where no single act alone rises to that level.

8 C.F.R. § 214.14(b). Ultimately, eligibility for U visa interim relief must be made on "case-by-case determinations, using [these] factors as guidelines. . . . Through these factors, USCIS will be able to evaluate the kind and degree of harm suffered by the individual applicant, based upon the individual applicant's experience." 72 FR 53018.

The moving Plaintiffs suffered substantial physical and mental abuse as a result of the working and living conditions they were forced to endure. In their supporting declarations, the moving Plaintiffs describe how, while forced to work for the Defendants, the moving Plaintiffs were housed in hurricane-damaged, unrenovated, and overcrowded apartments. (Mejivar-Garcia Decl. at ¶¶ 6-7) The conditions at the apartments were deplorable. (Balladares Decl. at ¶ 7.) Moving Plaintiff Reyes Aguilar-Garcia declares that "[t]he carpet stunk, there were holes on the walls, there were a lot of cockroaches, the stove and the refrigerator were very old, and there were broken windows. I was sick with colds, coughs and fever. " (Aguilar-Garcia Decl at ¶ 4.) When

7

Plaintiff Aguilar-Garcia complained about these conditions, the Defendants responded by threatening to call the police if they did not accept the conditions. (Aguilar-Garcia Decl. at ¶ 4).

While the moving Plaintiffs were forced to work, the Defendants did not pay them for as long as twelve consecutive weeks during which they "lacked the most basic necessities to survive." (Mejivar-Garcia Decl. at ¶ 9). As a result of the long lapses between paydays, the moving Plaintiffs had to borrow money from friends, incurring ever-increasing debt, and having to find food "in the trash that the American residents threw out," which Plaintiff Mejivar-Garcia described as "shameful." (Mejivar-Garcia Decl. at ¶ 10). Plaintiff Aguilar-Garcia's emotional trauma was also pronounced. He describes feeling fear, shame, and "sadness due to lack of ability to support my family that was suffering in Honduras." (Aguilar-Garcia Decl. at ¶¶ 8-9). Physically, he experienced hunger, sleeplessness, and once nearly fainted from the stress. (Aguilar-Garcia Decl. at ¶ 9).

When the Plaintiffs attempted to stop working because they were not paid, their employers threatened them with eviction and deportation. (Mejivar-Garcia Decl. at ¶ 11). They returned to work because they were "afraid." (Mejivar-Garcia Decl. at ¶ 12). Moving Plaintiff Mejivar-Garcia indicates, "I felt very bad in my mind and I suffered sadness because of this, but I didn't know what else to do other than to keep working." (Mejivar-Garcia Decl. at ¶ 12). When a group of workers were given five minutes to leave their apartment after they refused to work for no wages, the moving Plaintiffs' degree of fear increased. Plaintiff Mejivar-Garcia continued to work in these dismal conditions "out of fear, because I believed what they told us -- that Mr. Chuck would

8

report us to the police so they would deport us to our country; and that they evict us from our housing immediately if we didn't return to work.." (Mejivar-Garcia Decl. at ¶14). Plaintiff Aguilar-Garcia testifies, "I was afraid and decided to continue working." (Aguilar-Garcia Decl. at ¶ 7).

The culmination of the Defendants' actions – the arrest and placement of deportation proceedings of the moving Plaintiffs and others – was devastating, with physical and mental health consequences for the moving Plaintiffs. Plaintiff Mejivar-Garcia testifies:

> I got sick in the prison and I suffered a lot of sadness for the situation of being detained and having been exploited by the bosses of Audubon. It was very frustrating to be mistreated this way. It is a tremendously shameful thing that I have not been able to support my family economically. My regret was too great to bear, having to explain to them that I came to the United States and was working without payment in a job I was not free to abandon. I am afraid that my sisters had to quit their studies and that they are wanting for the necessities in Honduras. I feel that I have failed by not being able to help them economically and it is a great sadness. . . . The experience of working under the threats at Audubon Pointe continues to affect my thinking and the fear that I feel.

(Mejivar-Garcia Decl. at ¶¶ 19-20). Plaintiff Balladares suffers similar ongoing effects:

> Although I got out of jail a week ago, I still get very depressed because of the abuse I suffered by the bosses at Audubon Pointe. Because of the humiliation of working like a slave for so long without being paid, I did not contact my family. It is very hard to continue this way. Only my faith in God's salvation sustains me with the belief that my situation will get better.

(Balladares Decl. at ¶ 18.)

Because of the pervasive nature of the Defendants' abuses and the significant trauma suffered by the moving Plaintiffs, they can show that they have suffered substantial physical and mental abuse, thereby making them eligible for U visa interim relief.

9

### 3. The Moving Plaintiffs Possess Information about Defendants' Involvement in the Crime of Involuntary Servitude

To receive U visa relief, an alien must "possess[] information" concerning the alleged criminal activity. See 8 U.S.C. § 1101(a)(15)(U)(i)(II); see also 8 C.F.R. § 214.14(b)(2) (the petitioner must have "knowledge of the details" and "possess specific facts" sufficient to show that the petitioner "has, is, or is likely" to assist the prosecution of the crimes.) As set forth in the moving Plaintiffs' supporting declarations, the moving Plaintiffs have intimate and detailed knowledge of the Defendants' crimes.

### 4. The Moving Plaintiffs Have Been Helpful, are Being Helpful, or are Likely to be Helpful" in the Investigation or Prosecution of Defendants' Crimes.

The final requirement for U visa relief is that the petitioner "has been helpful, is being helpful, or is likely to be helpful" to the law enforcement agency or judge investigating or prosecuting the crime. See 8 U.S.C. § 1101(a)(15)(U)(i).

Here, the moving Plaintiffs have filed the instant lawsuit alleging that Defendants committed the crime of involuntary servitude, see 18 U.S.C. § 1590 (incorporating 18 U.S.C. § 1584) and the substantively identical crime of forced labor, see 18 U.S.C. § 1589, for which a private right of action was extended by 18 U.S.C. § 1595. The Plaintiffs' civil action under the TVPA requires that these claims satisfy the elements of, and be litigated under the applicable criminal statutes. 18 U.S.C. § 1595(a). As such, the moving Plaintiffs proceed in this civil action under the criminal statutes qualifying for U visa relief. 8 U.S.C. § 1101(a)(15)(U)(iii). The moving Plaintiffs' bringing the instant lawsuit itself -- a private prosecution of these crimes -- is manifestly being "helpful" to the Court's investigation of Defendants' criminal activity.

Similarly, the moving Plaintiffs have brought their charges before the U.S. Department of Justice Civil Rights Division ("DOJ/CRD"), which has principle responsibility for prosecuting human trafficking-related offenses. The moving Plaintiffs are making themselves available to the DOJ/CRD's investigation. If criminal prosecution of the Defendants ensues, it will most likely occur before this Court.

### B.  This Court may Certify that the Moving Plaintiffs Are Assisting the Investigation of the Defendants' Crimes.

As set forth above, an alien applying for U nonimmigrant status must provide a certification from a law enforcement official or judge that the alien is "has been helpful, is being helpful, or is likely to be helpful" in the investigation or prosecution of the underlying crime. See 8 U.S.C. § 1184(p)(1). Recognizing that judges technically "neither investigate crimes nor prosecute perpetrators," U.S. Citizenship and Immigration Services ("USCIS") suggests that "the term 'investigation or prosecution' should be interpreted broadly." 72 FR 53020.

In the instant case, this Court is the appropriate certifying authority. Because the instant lawsuit is venued before this Court, this Court bears the responsibility to investigate and prosecute -- under the broad definition set forth in the USCIS guidelines -- the alleged involuntary servitude crimes.

U.S. Customs and Immigration Service regulations direct the certifying official to complete and sign Form I-918, Supplement B, "U Nonimmigrant Status Certification." See 8 C.F.R. 214.14(c)(2)(i). U.S.C.I.S. instructions regarding this form have been attached to this motion as Plaintiffs' Exhibit 4. Proposed completed Form I-918

Supplement B certification forms corresponding to each of the three moving Plaintiffs have been attached hereto as Plaintiffs' Exhibits 5-7.

### C.  This Motion Should Be Considered on an Expedited Basis

Moving Plaintiff Reyes Aguilar-Garcia is currently in ICE custody awaiting imminent removal without further judicial process. ICE has thus far ignored Mr. Aguilar-Garcia's pending request to stay proceedings pending this Court's adjudication of his petition for U visa certification. Mr. Aguilar-Garcia could be removed at any time. Plaintiffs Fredi Umberto Mejivar-Garcia and Jose Salvador Balladares have been released on bond from ICE custody but are the subject of ongoing removal proceedings before the Immigration Court in Oakdale, Louisiana. Therefore, the moving Plaintiffs respectfully request that the Court consider this motion on an expedited basis to prevent these Plaintiffs from being removed from the United States before the issues pending before this Court are adjudicated.

### V.  Conclusion

For the reasons set forth herein, the Plaintiffs' emergency motion for U visa certification should be granted.

Respectfully Submitted,

_____/S/ Vanessa Spinazola_
LSBN 31328
The Pro Bono Project
615 Barrone Street, Suite 201
New Orleans, LA 70113
Tel: (504) 581-4043

Mary C. Bauer
*Pro Hac Vice*
Virginia State Bar # 31388
Andrew H. Turner
Virginia State Bar # 48853 (*Pro Hac Vice* Motion Pending)
Immigrant Justice Project
Southern Poverty Law Center
400 Washington Ave.
Montgomery, AL  36104
Tel: (334) 956-8326
Fax: (334) 956-8481

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that I have this date electronically filed the foregoing *Memorandum of Law in Support of Plaintiffs' Emergency Motion for U Visa Certification* with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification to the attorneys for the Defendants. I further certify that I have served the following attorneys for Defendants with a courtesy copy of this motion via express mail.

> James M. Garner
> Elwood F. Cahill, Jr.
> Debrah J. Fishman
> Sher Garner Cahill Richter Klein & Hilbert, LLC
> 909 Poydras St.
> 28th Floor
> New Orleans, LA 70112-1033
> Phone: 504-299-2100
> Fax: 504-299-2300

This 1st day of April, 2008.

                                                  **/S/ Vanessa Spinazola**